375 A.2d 515 (1977)
Gloria A. HOLLINGSWORTH, Petitioner,
v.
DISTRICT OF COLUMBIA UNEMPLOYMENT COMPENSATION BOARD, Respondent.
No. 9707.
District of Columbia Court of Appeals.
Submitted November 20, 1975.
Decided July 1, 1977.
*516 John P. Sizemore, Washington, D. C., was on the brief for petitioner.
Bill L. Smith, George A. Ross, and Robert J. Hallock, Washington, D. C., were on the brief for respondent.
Before GALLAGHER and NEBEKER, Associate Judges, and REILLY, Chief Judge, Retired.
REILLY, Chief Judge, Retired:
This is a petition for review of a decision of the District Unemployment Compensation Board holding petitioner ineligible for unemployment benefits on the ground that petitioner was not "available" for work, as required by D.C.Code 1973, § 46-309(d).[1]
The petitioner, a married woman, was employed by the Chesapeake & Potomac Telephone Company as a directory assistance operator from August 1971 to May 24, 1974, when she obtained maternity leave. She became the mother of twins on October 26, 1974. After an extension of her leave for about one month, petitioner resigned from her job on January 16, 1975, and applied three weeks later for unemployment compensation. Her application was rejected by a claims deputy, who made a determination of ineligibility, noting on the form 
You left your last job because the uncertain hours of work made child care difficult. You are not available for two shifts out of three for work, therefore, you are ineligible for benefits.
The claimant filed an appeal, and subsequently testified at a hearing before an appeals examiner, who also heard testimony presented by her former employer at the telephone company. Both parties were represented by counsel. On April 15, the examiner served written findings of fact upon the parties and sustained the preliminary determination. The claimant appealed to *517 the Board, but was unsuccessful  the Board in its final order adopting the findings and conclusions of the appeals examiner.
Briefly summarized, petitioner's testimony was:
She was responsible for the care of three adopted children as well as the newlyborn twins, and her new baby sitter would not report before 8 A.M., stay after 6 P.M., or work on weekends. This prospect caused her to give up her old job with the telephone company, as her scheduled hours of duty there occasionally required night work. She therefore decided not to apply for employment at other exchanges, but to obtain a job in some retail store because she had experience as both a salesclerk and a stockclerk in various suburban outlets before her employment as a telephone operator. She admitted that she had applied in person to only one employer  Antioch Law School, where she sought employment as a switchboard operator  but had telephoned several retail establishments and was told they were not hiring. She also read the "help wanted" advertisements in the local daily newspapers.
According to a witness from the telephone company, the claimant had not forfeited her seniority under the union contract by her leave of absence, and had sufficient seniority to claim a daytime tour of duty beginning at 9 A.M. and ending at 5:30 P.M., but never requested such an assignment, although she had telephoned and talked to one of the traffic supervisors prior to submitting her resignation. The claimant conceded that she had never inquired about this possibility because she had the impression that the company was reducing the number of traffic assistance operators. The telephone representative stated that his company had not hired new personnel for several months, but added that because of a policy against layoffs, claimant's position on the seniority list had been preserved, so that she could have been reinstated at any time prior to her own decision to quit.
Insofar as relevant, the appeals examiner found:
(1) Petitioner wanted to restrict the hours during which she would be available for work.
(2) Petitioner was seeking work by making telephone calls and checking advertisements, with only one in-person visit.
(3) Petitioner did not approach her former employer to try to work out an assignment to daytime hours, although the employer indicated it might be possible to work something out.
The examiner concluded that:
[C]laimant [petitioner] was not available for work . . . . The Board has interpreted the law's availability for work requirement to mean that a claimant, to be found available for work, must be making a reasonable in person work search each week and must place no unreasonable restrictions on his acceptance of work. The claimant has not met either of these tests. . . .
In urging reversal of the final order denying benefits, petitioner contends that the findings of the appeals examiner, which the Board adopted in its decision, are not supported by evidence, and that the conclusion was erroneous as a matter of law. On the second issue, her argument is that neither the statute nor the published regulations of the Board requires that a claimant demonstrate a willingness to work two shifts out of three, or to apply for jobs in person in order to demonstrate availability for work within the meaning of § 46-309(d).
Unlike Hill v. District Unemployment Compensation Board, D.C.App., 302 A.2d 226 (1973), upon which petitioner relies, there are no disputed issues of fact here. In Hill, we reversed a Board decision adverse to claimant because the appeals examiner, without explanation, rejected testimony showing claimant had made numerous job contacts in her search for work. As that particular examiner had not conducted the hearing and therefore had no opportunity to appraise the credibility of the witness, the proceedings were fatally defective. In the case before us the appeals examiner did not question the truth of any of the witnesses, for his findings reveal that he accepted *518 both the testimony of claimant and the representations of the telephone company. Hence, the relevant findings of fact have ample evidentiary support.
Accordingly, it appears that what petitioner is really objecting to are the inferences the examiner drew from the admitted facts which caused him to conclude that she was not "available for work"  a phrase which the courts of this jurisdiction have held means that a claimant must be genuinely attached to the labor market and making an active search for work.[2] The record does not show that petitioner was unsuccessful on appeal because she concededly was not available for employment on at least two shifts out of three  although this was the reason given by the claims deputy for denying compensation  for the appeals examiner in his written findings did not mention this factor, or even suggest it as a crucial measure of eligibility.[3] Instead, he rested his conclusions on the entire situation presented to him by the evidence.
In the Doherty case,[4] we noted that a few sporadic letters to possible employers whose offices were too distant to make a personal interview feasible, were not indicia of an active search for work. We regard the failure of the petitioner to apply in person to more than one employer as relevant evidence supporting the appeals examiner's similar conclusions in this case. While a telephone response to a caller stating that the particular company was not hiring anyone at the moment might, under some circumstances, justify a job applicant in not pursuing the matter further, a consistent failure to present oneself to any of the central personnel offices of the local chain or department stores, where interviews and review of written applications are routine matters, is quite different. Moreover, if the claimant's testimony that she regularly read the "Help Wanted" notices is to be accepted at face value, it is difficult to understand why she did not seek interviews with the employers placing such advertisements. She advanced no explanation for this inconsistency.
Another relevant piece of testimony was the fact that petitioner never tried to return to her job with her last employer, the telephone company, or even to inquire about the possibility of working out an assignment for another schedule of hours consistent with her obligations to her children when her baby sitter was not on duty. As the last employer is usually the first person to whom an unemployed person turns when ready to work again, the appeals examiner quite properly took this aspect of the case into consideration in passing upon the appeal. Accordingly, we deem his findings and conclusion not only supported by the evidence, but correctly reflecting the law of this jurisdiction as stated in the Doherty, supra, and General Railway Signal[5] cases.
In passing, we note that much of the difficulty the agency encountered in weighing the evidence in this case could have been avoided. It is fundamental that when a claimant's restrictions upon the kind of employment acceptable to him precludes his returning to his job with his last employer, he is ineligible for unemployment benefits. Both the petitioner  and apparently the appeals examiner  overlooked this principle, for the record shows that her old job was awaiting her when her maternity leave expired. Their premise was that unless the restrictions were unreasonable  which the *519 claims deputy and ultimately the Board felt was the case  petitioner was entitled to compensation. Petitioner stresses that her unwillingness to work her former shift was not her fault, as her inability to secure adequate child care services made it necessary for her to restrict her availability for jobs requiring night work. She argues that as a matter of social policy, mothers whose commendable first duty it is to supply adequate care for their children should not be deprived of benefits, where the performance of such maternal obligation is the cause of their unemployment.
What petitioner overlooks is that the kind of unemployment compensation act which Congress adopted for the District  popularly called a merit rating system  was intended to stir employers to stabilize employment by providing a tax incentive for the avoidance of economic layoffs. The heart of this statutory scheme  set forth in § 3 of the Act[6]  is to relieve employers from the standard payroll tax rate, if they can demonstrate by experience over a stated period that compensable layoffs have been held below a certain percentage. In order to compute such reduced rates, the Board maintains a separate account for each employer, and unemployment benefits paid to his employees are charged to his account. Such benefits are not payable, however, to employees unable to continue work because of sickness or injury,[7] or physically unable to work at all. It is plain that if persons forced to give up work because of some temporary or permanent disability are ineligible, the same principle is equally applicable to persons forced to leave their jobs  not by their employer  but because of wholly understandable changes in family obligations.
In a leading case, where the facts were very much like those in the case before us, a claimant employed on the third shift of a textile plant left her job when a relative who had looked after her children moved away from the community. She refused offers of reemployment, saying she was available only on the first or second shifts. When her claim for unemployment compensation was denied, she appealed. The Supreme Court of South Carolina, noting that a tax provision in that act was identical to the corresponding employer contribution plan embodied in our statute, affirmed. That court said:
The primary purpose of this provision would be greatly impaired, if not completely defeated, if benefits were paid to persons who become unemployed, not because the employer could no longer provide them with work but solely because of changes in their personal circumstances. . . . [In order to be entitled to benefits . . . the unemployed individual must be able to and available for the work which he or she had been doing. [Mills v. S. C. Unemp. C. Comm'n, 204 S.C. 37, 42, 28 S.E.2d 535, 537 (1944).]
Accord, Ford Motor Co. v. Appeal Bd. of Mich. Unemp. C. Comm'n, 316 Mich. 468, 25 N.W.2d 586 (1947); Bigger v. Unemp. C. Comm'n, 43 Del. 274, 46 A.2d 137 (1946), aff'd, 43 Del. 553, 53 A.2d 761 (1947); Brown-Brockmeyer Co. v. Board of Review, 70 Ohio App. 370, 45 N.E.2d 152 (1942) (where claimant, who because of susceptibility to colds quit her work in office subject to drafts, was not held available for work as prior job was still open to her).
Affirmed.
NOTES
[1] D.C.Code 1973, § 46-309, reads in pertinent part:

An unemployed individual shall be eligible to receive benefits with respect to any week only if it has been found by the Board 
* * * * * *
(d) that he is available for work and has registered and inquired for work at the employment office designated by the Board, with such frequency and in such manner as the District of Columbia Council may by regulation prescribe. . . .
[2] Doherty v. District of Columbia Unemp. C. Bd., D.C.App., 283 A.2d 206, cert. denied, 406 U.S. 932, 92 S.Ct. 1764, 32 L.Ed.2d 135 (1971); National Geographic Society v. District Unemp. C. Bd., 141 U.S.App.D.C. 313, 438 F.2d 154 (1970); Woodward & Lothrop, Inc. v. District of Columbia Unemp. C. Bd., 129 U.S.App.D.C. 155, 392 F.2d 479 (1968).
[3] Petitioner's assumption that unavailability for certain shifts cannot make a claimant ineligible for unemployment compensation in the absence of statute or specific regulation is a dubious one. See Ford Motor Co. v. Appeal Bd. of Mich. Unemp. C. Comm'n, 316 Mich. 468, 25 N.W.2d 586 (1947), and Mills v. S. C. Unemp. C. Comm'n, 204 S.C. 37, 28 S.E.2d 535 (1944), for holdings to the contrary.
[4] Supra note 2.
[5] General Railway Signal Co. v. District Unemp. C. Bd., D.C.App., 354 A.2d 529 (1976).
[6] D.C.Code 1973, § 46-303.
[7] D.C.Code 1973, § 46-309(c).